UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

Jose Velez,

                        Plaintiff,

        -against-

Michael O'Brien, et al.,

                        Defendants.

------------------------------------------------------------ x

Plaintiff's Response In Opposition
To Defendants' Motions In Limine

No. 15 Civ. 7441 (VEC)

Plaintiff Jose Velez brings this action against Defendant Detective Michael O'Brien and Defendant Detective Paul Jurgens alleging violations of his civil rights pursuant to 42 U.S.C. § 1983. On May 8, 2017, Defendants filed motions in limine. This is Plaintiff's response in opposition.

    I.    **Plaintiff Should Be Permitted To Offer In Evidence The Medical Exposure Report Relating To The Jose Velez Incident Which Defendant O'Brien Testified At Deposition Related To Another Case**

At deposition, O'Brien testified under oath that he did not observe Velez to be injured when he and Jurgens arrived on the scene, Exhibit 1 at 213 (O'Brien noting that Velez did not look like he needed emergency treatment when Defendants arrived on the scene); that he "did not recall" punching Velez in the face, id. at 174[1]; and that his use of force upon him was limited

---

[1] "Q: "[D]id you ever hit Mr. Velez in the face? A: I don't recall punching Mr. Velez in the face, no. Q: When you say you don't recall punching him in the face, [do] you mean it could have happened? A: No. I don't recall punching him in the face. I don't recall, you know, punching him in the face at all. Q: Are you saying you definitively did not punch him in the face? A: I'm saying I definitively do not recall me punching him in the face." Exhibit 1 at 174.

1

to the deployment of mace and struggling to control his arms, id. at 164. As for Jurgens, he testified that he did not recollect Velez being injured when he and O'Brien arrived on the scene, either, Exhibit 2 at 47-50, 87-88; and that he could not recall whether O'Brien punched Velez in the face, either. Exhibit 2 at 55. According to Jurgens, he was holding Velez's arm, and while he was doing that he could not see whether O'Brien punched Velez in the face. Id. at 54-55.

Despite Defendants' failure to observe Velez seriously injured when they arrived on the scene, and despite Defendants' claim that no one punched Velez in the face, O'Brien's memo book shows that on September 22, 2012, as he processed the Velez arrest, he reported coming into contact with an individual's blood. Exhibit 1; Exhibit 3 (memo book); Exhibit 4 (medical exposure report).

The following exchange occurred when I questioned O'Brien at his deposition about the reference to the medical exposure report in his memo book:

| Lozar: | ... [W]hat is it, exposure number? |
| O'Brien: | Medical exposure number, yes. |
| Lozar: | What does all this mean[]? |
| O'Brien: | It is something completely unrelated. I believe, that I did come in contact with blood on a previous tour. I was calling to get an exposure number. |

Exhibit 1 at 80. Then, later, when I mentioned it again, O'Brien was swift to disassociate the report with the Velez arrest:

| Lozar: | In your memo book you alluded to this conversation [about the exposure number] with Police Officer Dickson that was unrelated to this case. It says: Obviously, they'll be back on the 24th. |
| O'Brien: | That was for the sick desk to get an exposure number that has nothing to do with – |

Stein: Just note my objection . . .

Id. at 212.

Because O'Brien specifically remembered at deposition that he had been exposed to blood, as opposed to another bodily fluid, and the exposure report was made in the middle of O'Brien's nearly fifteen-hour exclusive handling of Velez's arrest, I requested the medical exposure report to verify O'Brien's testimony.[2] Exhibit 3.

As the Court may recall, Defendants objected to the production of the medical exposure report, requiring Plaintiff to file a motion to compel. Docket No. 34. At related conference, Defendants opposed the production of the report, arguing that because O'Brien testified under oath that the report was unrelated to his being exposed to Velez's blood, it was unrelated to this litigation. Docket Entry 1/20/2017.

On January 19, 2017, the Court ordered Defendants to produce the medical exposure report. Docket No. 35.

Two months later, on March 3, 2017, the day that fact discovery closed in this case, Defendants produced the medical exposure report. It shows O'Brien reporting that he came into contact with Velez's blood during the September 22, 2012, arrest, and receiving instructions to speak to a district surgeon about HIV. Exhibit 4.

---

[2] Notably, although O'Brien testified that he maced Velez, and sprayed himself and Jurgens in the process, not only did Jurgens not remember O'Brien spraying him with mace, but neither O'Brien or Jurgens sought treatment for exposure to a chemical agent in the aftermath of the Velez arrest. Exhibit 1 at 170 (Q: Did you receive any treatment for your exposure to mace? A: No.); Exhibit 2 at 84-86 (Q: Were you ever treated for exposure to a chemical agent in connection with this arrest? A: No. Q: Was it because you weren't exposed to a chemical agent? . . . A: I didn't have any chemical agent on me. . . . Q: Would it be a surprise that [O'Brien] testified that he sprayed Mr. Velez, and that you and he were both exposed to mace? A: Am I surprised I was sprayed by mace? Q: Yes. Stein: Over objection, you could answer. A: No. Q: You're not surprised? A: I don't know. I didn't get sprayed by mace.").

After previously telling the Court that O'Brien swore under oath that the medical exposure report had nothing to do with Velez, Defendants now argue that this evidence should be precluded at trial. But in light of the foregoing, Plaintiff argues that the medical exposure report is admissible as direct and impeachment evidence.

Defendants argue that the report must be excluded at trial under FRE 403. The Second Circuit has held that although a trial court must perform FRE 403 balancing, "[FRE] 403 favors admissibility." U.S. v. White, 692 F.3d 235, 247-48 (2d Cir. 2012). "[E]vidence is only excluded when its probative value is <u>substantially outweighed</u> by the prejudice of jury confusion." Id. (emphasis in original). That is because "[g]enerally speaking, any proof highly probative of [liability] is prejudicial to the interests of that defendant." U.S. v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995) (discussing that probative evidence is by its nature prejudicial in the context of criminal prosecution). "The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that justified its admission into evidence.'" Id. (citing U.S. v. Figueroa, 618 F.2d 934, 943 (2d Cir. 1980)).

Defendants argue that the probative value of the report as direct evidence is outweighed by its prejudicial effect. But Defendants' argument is precisely what, according to the Gelzer Court, FRE 403 does not preclude. In this case, the report showing that O'Brien was exposed to Velez's blood during the arrest is plainly relevant, as it tends to prove various material propositions of fact. See, e.g., Graham v. City of N.Y., 928 F. Supp.2d 610 624 (E.D.N.Y. 2013) (stating that a plaintiff must prove that force was used, and that the force was excessive or objectively unreasonable under the circumstances). For example, if a jury found that the report proved that Defendants punched Velez, then naturally that is prejudicial to Defendants' preferred

version of events, but that is the essential nature of probative evidence, and not what FRE 403 was designed to combat. See Gelzer, 50 F.3d at 1139.

Defendants claim that the reason the report is prejudicial is because it documents an "insignificant detail" relating to this dispute. Docket No. 46. According to Defendants, the report is almost redundant because medical records already document Plaintiff's injuries. But this ignores the report's unique relevance in light of Defendants' sworn testimony about Plaintiff's condition when they first encountered him, and Defendants' sworn testimony that at most they maced and struggled to handcuff Velez's arms.

In addition to being direct evidence relative to elements of Planitiff's claims, the report is also admissible as impeachment evidence. As the Honorable Jack B. Weinstein of the United States District Court for the Eastern District of New York has observed in his book on evidence, a witness's

> misstatement about the weather on the day the witness signed a petition in bankruptcy is not particularly conclusive on the credibility of the witness's denial of any intent to defraud creditors. On the other hand, a mistake about the weather may be probative both of a substantive issue and the witness's lack of credibility if the witness is claiming to have been in Tucson on the day that the prosecution claims that the witness committed murder in Maine.

Jack B. Weinstein & Margaret A Berger, Weinstein's Evidence Manual, § 12.01[4] (Joseph M. McLaughlin, ed., Matthew Bender 2014) (citing U.S. v. Robinson, 544 F.2d 110, 114 (2d Cir. 1976)). In other words, the central or collateral nature of impeachment evidence is important to a court's admissibility analysis. Here, O'Brien's claimed "mistake" as to whether the medical exposure was related to the Velez arrest is probative of O'Brien's lack of credibility because of the centrality of the report to whether excessive force occurred but also because, as described above, O'Brien volunteered that the medical exposure had to do with a different arrest while

plainly remembering that it involved blood in particular. Finally, it should be noted that Jurgens testified at deposition about how rare suffering a medical exposure to blood has been in his career, stating that in eight years, he only had occasion to file a medical exposure report once, and that was for smoke inhalation. <u>Exhibit 2</u> at 57-58. In light of that fact, a reasonably jury could plausibly find O'Brien incredible in his claimed confusion about such a central fact.

In light of the foregoing, Plaintiff asks that the Court permit the medical exposure report to be admitted at trial as direct and impeachment evidence.

## II. Plaintiff Should Be Permitted To Offer In Evidence The Insurance Records

Defendants argue that the insurance records relating to the damage to the parked vehicles should be precluded as irrelevant and prejudicial. <u>Document No. 46</u> at 10. This argument is surprising because, just one page earlier, Defendants tell the Court that "[i]t should be noted that [D]efendants contend that the majority of [P]laintiff's injuries were sustained during his car accident[.]" <u>Id.</u> at 9 n.2. This is a classic example of Defendants wanting to have their cake and eat it, too. Defendants cannot credibly argue on the one hand that Plaintiff's accident was so terrible (Plaintiff contends it wasn't) that it caused him multiple concussive blows to the face (Plaintiff contends it didn't), then ask the Court to deny Plaintiff the opportunity to show a jury through actual evidence, rather than conclusory statement, that Defendants' version of events is unsupported by facts.

Defendants state that they "anticipate that [P]laintiff will seek to offer the insurance records into evidence in an attempt to illustrate how fact (or slow) [P]laintiff's car was traveling" at the time of the crash. <u>Id.</u> at 10. That's exactly right. In fact, Plaintiff revealed this as early as the initial conference with the Court on August 12, 2016, <u>Docket Entry 8/12/2016</u>, issued a FRCP 45

subpoena to gather the records during discovery, produced them to Defendants, and both sides have retained experts who reviewed the insurance records in preparing their respective reports.

### III. Plaintiff Should Be Permitted To Offer In Evidence The NYPD Radio Signal Codes

Defendants' first argument against this record is that it "not created by a member of the NYPD." Docket No. 46. But this is what Defendants produced to me in response to an email addressing discovery deficiencies that asked for the NYPD's radio signal code sheet. Exhibit 5. Defendants' current complaint that they pulled the radio signal code sheet off of the Internet is not a fair attack against its admissibility insofar as they were the ones who produced the record and represented that it was responsive to the related discovery demand.[3]

The potential relevance of the signal-code issue has to do with the way in which translation of signal codes may permit the Parties to reconstruct the chronology of events for the jury using, for example, SPRINT reports and/or other municipal records which code arrivals, departures and other events for ease of annotation. For example, as a Party uses a witness to interpret a record for the purposes of a timeline reconstruction, the witness might find the signal codes useful in refreshing his/her recollection as to what one code or another is meant to communicate. See People v. Goldfeld, 60 A.D.2d 1, 11 (4th Dep't 1977) (finding that an exhibit was properly used to refresh a witness's recollections).

Finally, Defendants assert that my "sole purpose" in using the radio signal codes would be to violate Rule 611 of the Federal Rules of Evidence by engaging in an embarrassing and harassing mode of examining witnesses. Docket No. 46. At the outset, I am not sure why Defendants suspect that I am planning to examine witnesses unprofessionally. I find it particularly confusing because

---

[3] Even though Defendants are complaining about an alleged problem of their own making, I do not mind if they substitute the radio signal codes they produced to me with an official version. In fact, I would be glad to have the more accurate record.

I fail to see how one or a few uses of the code sheet to refresh the recollection or to stimulate the memory of an officer is embarrassing or harassing. It seems that such technical minutiae is very understandably the sort of thing that might require someone to occasionally consult a reference.

### IV.  Plaintiff Should Be Permitted To Call The Vehicle Owners To Testify

Defendants argue that Plaintiff should not be able to call any of the owners of the parked vehicles to testify about the positioning of their vehicles at the time of the accident. Docket No. 46. Defendants contend that the vehicles' locations have "zero probative value" relative to the speed at which Plaintiff struck the parked cars. Id. But this does not make sense. Insofar as Plaintiff's vehicle struck the parked cars after he turned from Avenue C onto East 11th Street, the parked vehicles' locations have tremendous probative value vis-à-vis how fast Plaintiff was traveling at the time of the accident. Because East 11th Street begins at Avenue C, the fact that the parked vehicles were the very first parked vehicles on East 11th Street means that Plaintiff's vehicle could not have gathered much speed after the turn. By seeking to eliminate the parked vehicles' location from the record, Defendants might seek to suggest to the jury that the parked vehicles may have been much further down East 11th Street, at a location that would have permitted Plaintiff to be going much faster than he actually was.

Defendants misleadingly suggest that other evidence in the record already establishes the parked vehicles' locations at the time of the accident. For example, Defendants suggest that Dr. Pugh can testify about the parked vehicles' locations. It is not clear why Defendants believe that Dr. Pugh is a better source for that information than the parked vehicles' owners. The parked vehicles' owners, contrary to Defendants' assertion, may not have been present for the accident, but they were present when they parked their vehicles, and they were also present when they returned to them and found them damaged.

In terms of the vehicle owners' testimony being cumulative and a waste of time, Plaintiff has no intention of calling every single one of them as a trial witness. One will suffice, because once the location of one of the parked vehicles is established, a jury will be able to immediately deduce the relative locations of the rest of the vehicles.

V. **Plaintiff Should Be Permitted To Mention The NYPD Patrol Guide**

During discovery, Plaintiff explored why, in this case, where his physical condition after an alleged police assault is at issue, Defendants and other officers did not take photographs or videorecordings of Plaintiff as departmental protocols require. For example, O'Brien testified that Velez gave his consent to a blood test, Exhibit 1 at 179, and his memo book also notes that the "deft agrees to blood test," Exhibit 3. However, protocols relating to the documentation of that consent and/or related coordination tests—most notably, that they be videorecorded—were not followed due to an alleged lack of camera even though a highway patrol officer who is specifically assigned to aiding in documenting consents and performance of these tests was called to the scene. Perhaps obviously, Defendants will attempt to cast this inability to make a visual record of Plaintiff as a harmless coincidence. At the same time, Plaintiff argues that he should be permitted to argue that this departure from regular protocol, when following it would arguably have created a record clearly documenting injuries from a use of force, is evidence that Plaintiff's arrest may have diverged from protocol with intention. After hearing O'Brien's explanation for the failure to record, jurors can determine for themselves whether it is a credible one.

Defendants argue that it would be inappropriate for the Court to permit in evidence patrol guide procedure numbers because violation of the constitution, and not police procedure, give rise to a Section 1983 claim. Docket No. 46 at 14. However, Plaintiff is not proposing that the

NYPD Patrol Guide procedure numbers would stand as a constitutional measure of conduct. Here, Plaintiff is proposing that in certain circumstances, such as the videorecording rule, a Defendant's failure to comply is a circumstance to be considered in connection with the totality of the circumstances. In a way, Defendants' failure to create a visual record of Velez where one was required (because, Plaintiff contends, the record would have documented Velez's physical injuries as a result of the assault), is similar to O'Brien's claim that the blood exposure did not occur in the context of the Velez arrest. Just like the withholding of the blood exposure report relating to Velez's arrest would have permitted Defendants' version of events to be presented without any contradiction, the unusual absence of a visual record of Plaintiff in a case with these facts benefits Defendants' ability to tell a story that his injuries were caused by the accident, without the meddlesome fact of a picture showing multiple concussive injuries to his face. Because Plaintiff contends that Defendants' deliberate failure to create a visual record that day benefits them now, they should not be able at trial to express confusion as to whether they misunderstood their obligation to video- and/or photo-document arrest-related events. The police procedure records need only introduced in the event that Defendants misrepresent the handling of such arrests.

### VI. Plaintiff Agrees To Refer To Defense Counsel As Attorneys From The Corporation Counsel, As Defendants Request

### VII. Plaintiff Agrees That, Barring Defendants' Opening The Door, There Will Be No Reference To Indemnification

Generally speaking, Plaintiff agrees that there will be no reference to indemnification at trial. However, insofar as the "law is clear that a defendant may 'open the door' to admission of an indemnity agreement by introducing evidence of financial constraint," Plaintiff's agreement

not to mention indemnification is conditioned upon Defendants not opening the door. <u>Anderson v. Aparicio</u>, 25 F. Supp.3d 303, 314 (E.D.N.Y. 2014).

### VIII. Plaintiff Should Be Permitted To Request A Damages Range From The Jury

Defendants argue that Plaintiff should be precluded from requesting a specific amount in damages from the jury, citing to <u>Consorti v. Armstrong World Indus., Inc.</u>, 72 F.3d 1003, 1016 (2d Cir. 1995), in support of their position. More recently, in <u>Lightfoot v. Union Carbide Corp.</u>, 110 F.3d 898, 912 (2d Cir. 1997), the Second Circuit elaborated that it rejects a rule that <u>per se</u> prohibits this practice, and endorses a "more flexible approach." In particular, the Second Circuit explained that it lies with the discretion of the trial judge to decide whether to prohibit the mention of specific figures, or to "impose reasonable limitations, including cautionary jury instructions." <u>Id.</u> More specifically, in <u>Lightfoot</u>, the Second Circuit noted that the record did not demonstrate that a plaintiff's counsel unfairly influenced a jury's verdict when she recommended a $1,500,000 damages award, the court instructed the jury that it must craft an award "only upon and only in proportion to a showing as to the nature, duration and severity of his condition," and the jury returned a $750,000 verdict. <u>Id.</u>

More recently, in <u>Stanczyk v. City of N.Y.</u>, 752 F.3d 273, 279 (2d Cir. 2014), the Second Circuit denied a plaintiff's motion for a new trial on damages, citing a plaintiff's counsel's failure to provide "the jury with a reference point from which to gauge [the plaintiff's] damages. For instance, he elected not to suggest, nor even move for the opportunity to suggest, a specific damages figure to the jury." (citing <u>Lightfoot</u>). "Rather, as a review of his summation makes clear, [the plaintiff's] counsel relegated to the jury full discretion to award what it deemed proper." <u>Id.</u>

It thus appears that the Second Circuit's view on whether and to what extent a plaintiff's counsel may suggest a specific damages amount to a jury, or a range, accompanied by cautionary jury instructions, has evolved beyond Defendants' suggestion that it is disfavored. The question still remains firmly in a trial court's discretion, but the Second Circuit's discussion in <u>Stanczyk</u> suggests that, under some circumstances, failure to provide a jury with a "monetary reference point" may prejudice the award of damages.

### IX. Plaintiff Should Be Permitted To Question One Defendant Officer In Particualar About Previous Federal Civil Rights Force Lawsuits Clustered Close In Time To This One, As They Are Relevant To Pattern, Intent And Absence Of Mistake

Previously, Plaintiff unsuccessfully moved to compel certain of Defendants' personnel records. Even still, Defendants have moved <u>in limine</u> to preclude mention of Defendants' previous lawsuits, arguing that this would work undue prejudice upon them. Defendants' concern apparently centers around two federal lawsuits in particular that indicate that at least one Defendant has experienced two significant personnel events similar in nature to this one. Because the Defendant will argue that whatever force was applied to Plaintiff was reasonable such that he is entitled to qualified immunity, Plaintiff argues that these other force cases, similar in facts and clustered close in time to the instant case, are relevant because they tend to disprove whatever reasonable mistake argument the Defendant might make in his defense, and instead situate this event as part of a pattern and cast the Defendant's state of mind as intentional.

In <u>Collazo v. City of NY</u>, No. 09 Civ. 10514 (DAB) (SDNY), a Section 1983 plaintiff alleged that this Defendant used excessive force upon him after he had a bicycle accident and his use of his cell phone angered officers. The plaintiff ended in Bellevue Hospital; the Defendant settled the case for a sizable amount.

Later, in Reynolds-Mohler v. City of N.Y., No. 13 Civ. 5891 (AKH) (SDNY), a Section 1983 plaintiff alleged that the Defendant —the only named defendant in that case—used excessive force against him after the plaintiff allegedly challenged the Defendant's decision on how to help someone who was having a medical crisis. In Reynolds-Mohler, a video of the beating was produced to Corporation Counsel immediately upon filing of the action, and the Defendant settled the case within months for a very large sum.

In Ismail v. Cohen, 899 F.2d 183 (2d Cir. 1990), the Second Circuit affirmed a district court's admission in evidence of a Section 1983 defendant's prior wrongful acts. Addressing the FRE 403 prejudice and FRE 404(b) propensity objections, the Second Circuit held that the district court had "set forth several legitimate reasons" for the admission of the wrongful acts evidence, namely pattern, intent, absence of mistake, etc., and determined that the risk of unfair prejudice did not substantially outweigh the probative value of the evidence. Id. at 188-89.

Here, as in Ismail, Plaintiff does not seek admission of the Collazo and Reynold-Mohler cases and their resolutions in an effort to establish propensity vis-à-vis the subject Defendant. Instead, it is notable that in both Collazo and Reynold-Mohler, the force accusations were not just that the force was unreasonably disproportionate to the situation at hand. Instead, the allegations in both of those cases, of which the Court may take judicial notice, were that the Defendant, in the context of two innocuous situations, initiated and/or joined in a completely senseless beating of a civilian without any arguable justification. In this regard, these two federal lawsuits, like the wrongful act in Ismail, tend to establish that the Velez assault was part of a pattern, that the Defendant intended the harm caused to Velez, and that the Defendant cannot credibly claim unreasonable mistake in applying force. See Bradbury v. Phillips Petroleum Co., 815 F.2d 1356, 1362 (10th Cir. 1987) (affirming the district court's decision to permit prior

settlement evidence as falling outside of FRE 404(b)'s and FRE 408's proscriptions, noting that the district court properly instructed the jury that it may find that the series of like acts may show outrageous conduct where the defendants claimed that an isolated mistake had taken place); U.S. v. Gilbert, 668 F.2d 94, 97 (2d Cir. 1981) (finding an SEC consent decree admissible under FRE 404(b) to show the defendant's knowledge of administrative reporting requirements addressed in the decree); Dosier v. Miami Valley Broadcasting Corp., 656 F.2d 1295, 1300 (9th Cir. 1981) (admitting evidence of past, settled claims when an employer engaged in unlawful discrimination to establish a continuing pattern of like behavior); Brotman v. Nat'l Life Ins. Co., No. 94 Civ. 3468 (SJ), 1999 WL 33109, at *2 (E.D.N.Y. Jan. 22, 1999) (finding that although settlements are inadmissible to prove the underlying factual matters in the settled claims, FRE 404(b) permits the admission of wrongful act evidence to prove things like motive, intent, knowledge, and for other purposes).

Plaintiff thus argues that Collazo and Reynold-Mohler operate to show pattern, intent and mistake of fact in the Velez case. As here, both of those cases involved facts alleging a violent assault removed from any reasonable justification. For example, in Collazo, the bicyclist plaintiff who had crashed his bicycle alleged that the Defendant became angry and beat him to the point that he required treatment at Bellevue Hospital, apparently for texting his employer to state he would be late to work. In Reynold-Mohler, the good-samaritan plaintiff was passing by a random young woman experiencing an overdose in an apartment building lobby. The plaintiff, who apparently had some medical knowledge, interjected to say that the woman, who was being left alone, might suffer serious injury without some kind of stimulation to keep her from losing consciousness, and the plaintiff alleged that this enraged the Defendant, who then beat the plaintiff.

In light of the foregoing, a reasonable jury could plausibly find that these two federal civil rights cases, clustered close in time to <u>Velez</u>, and which the Defendants settled for substantial sums, go far in explaining the Defendant's confusing conduct under study in this litigation.

## X. Conclusion

For the foregoing reasons, Plaintiff respectfully requests that the Court grant the relief requested herein with respect to the various areas of testimony and items of evidence which Plaintiff is seeking to preclude from admission in evidence at the trial of this matter, and for all other relief that this Court deems necessary and appropriate.

Date: New York, New York
May 15, 2017

*/s/ Ryan Lozar*

Ryan Lozar, Attorney for Plaintiff Jose Velez
The Law Office of Ryan Lozar, PC
305 Broadway, 10th Floor
New York, New York 10007
(310) 867-1562
ryanlozar@gmail.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------- x
Jose Velez,

                          Plaintiff,        DECLARATION

              -against-                 No. 15 Civ. 7441 (VEC)

Michael O'Brien, et al.,

                        Defendants.

----------------------------------------------------------- x

**RYAN LOZAR**, for his declaration pursuant to 28 U.S.C. § 1746, states:

1. I represent Plaintiff Jose Velez in the above-captioned case. I make this declaration in support of Plaintiff's response in opposition to Defendants' in limine motions.

2. Attached to this declaration are the following exhibits:

Exhibit 1.    Relevant portions of Defendant O'Brien's deposition testimony.

Exhibit 2.    Relevant portions of Defendant Jurgens's deposition testimony.

Exhibit 3.    Defendant O'Brien's memo book.

Exhibit 4.    Defendant O'Brien's medical exposure report.

Exhibit 5.    Radio signal codes.

I declare under penalty of perjury that the foregoing is true and correct. Executed in New York, New York, on May 15, 2017.

Ryan Lozar
Law Office of Ryan Lozar
305 Broadway, 10th Floor
New York, NY 10007
(310) 867-1562
ryanlozar@gmail.com